IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| WILLIAM NEWCOMER, a married man as his separate estate,<br><br>      Respondent/Cross Appellant,<br><br>      v.<br><br>ESTATE OF MICHAEL COHEN and "JANE DOE" COHEN, husband and wife and the marital community of the composed; APEX PENTHOUSE CONDOS, LLC, a Washington limited liability company; and APEX APARTMENTS I TIC, LLC, a Washington limited liability company,<br><br>      Appellants/Cross Respondents,<br><br>MC APEX, LLC, a Washington limited liability company;<br>AMC FAMILY LLC, a Washington limited liability company;<br>ECKSTEIN INVESTMENTS, LLC, a Washington limited liability company;<br>ENTRUST NORTHWEST, LLC, a Washington limited liability company;<br>RB&F PROPERTY MANAGEMENT, LLC, a Washington limited liability company;<br>NEWCOMER APEX I TIC, LLC, a Washington limited liability company;<br>BILL DONOHOE; 2009 NEWCOMER FAMILY, L.L.C., a Washington limited liability company;<br>BR NEWCOMER, LLC, a Washington Limited Liability Company,<br><br>      Defendants. | No. 86612-5-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — This is the third appeal between parties involved in a real estate development project through multiple limited liability companies in Tacoma. Following a bench trial for a breach of contract claim related to a promissory note, the court entered a judgment in favor of William Newcomer, one of the project's investors, and against the estate of Michael Cohen,[1] Apex Penthouse Condos, LLC, and Apex Apartments I TIC, LLC. But the court denied Newcomer's request for attorney fees. We affirm the judgment in favor of Newcomer, but reverse the court's denial of his request for attorney fees and remand for further proceedings.

## FACTS

In 2004, Michael Cohen solicited William Newcomer to invest in the Apex Apartments venture. Cohen, Newcomer, and a third initial investor, Kenneth Thomsen, executed an operating agreement for Apex Apartments, LLC.[2] Apex Apartments, LLC was established to construct two apartment buildings in Tacoma, Washington, with a plan to either operate or sell the properties afterward. Each provided personal guarantees to the construction lenders. Cohen, Newcomer, and Thomsen each held a 30 and 1/3 percent ownership stake in the project. Cohen managed the project.

Article 8 in the Apex Apartments, LLC agreement addresses contributions to the company and capital accounts. The relevant sections under Article 8 are as follows:

> 8.1    Members Capital Contributions. Each member shall contribute such amount as is set forth in attached Schedule 1 as such Member's share of the Members' Initial Capital Contribution.
>
> 8.2    Additional Contributions. Each member shall be required to make such additional Capital Contributions as shall be determined by the

---

[1] The court in February 2021 granted Newcomer's motion to substitute Cohen's estate in his place as a party after Cohen died.

[2] Cohen signed as manager of MC Apex, LLC. Thomsen signed as manager of AMC, Family, LLC.

Manager from time to time to be reasonably necessary to meet the expenses of the Company; provided, such additional Capital Contributions shall not exceed 100% of each Member's Initial Capital Contribution except when approved by the written vote of 100% of the Members.

8.2.1   Before requiring additional Capital Contributions, a request to borrow the amount required shall be simultaneously sent to all Members. Such loans from Members shall bear interest at a rate of 12.00% per annum or upon terms as otherwise provided by the request.  . . . .

8.2.2   In the event that the interest of Members to make loans is not sufficient to cover the amount requested, the Manager shall give written notice to each Member of the amount of any required additional Capital Contribution, and each Member shall pay to the Company such additional Capital Contribution no later than thirty (30) days following the date such notice is given.  Nothing contained in this Section 8.2 is or shall be deemed to be for the benefit of any Person other than the Members and the Company, and no such Person shall under any circumstances have any right to compel any actions or payments by the Members.

8.2.3   In the further event that a member is unable, unwilling, or for whatever reason fails to pay such capital call by the 11th banking day after the call for funds is communicated to that Member in writing, then the following shall occur: the remaining Members shall have the right, but not the obligation, to buy on a pro-rata basis, all of the Units and interest in the Company held by the non-contributing Member.  If less than all Members elect to exercise their pro-rate right to purchase, the remaining Members or any one of them may purchase the interest of the non-paying Member. The purchase price shall be the value of the non-paying Member's Capital Account as recorded in the records of the Company, less the dollar amount of the non-paying Member's capital call which generated the default.  The intent is to penalize the non-paying Member and to ameliorate the unanticipated additional cost to those Members who comply with this Agreement.  In the event that no member is willing to buy the interest of the non-paying Member, then the Company will be dissolved in accordance with the terms of Article 14.

Schedule 1 listed the "Initial Capital Contribution" for each of the three initial members to

be $800,000.[3]   Newcomer contributed this amount in two installments.

---

[3] Eckstein Investments, Entrust NW, LLC, and RB&F Property Management, LLC became minority members of Apex Apartments, LLC.  These entities did not provide any personal guarantees, but did provide initial capital contributions of $100,000, respectively.  Each entity owned a 3 percent stake in the project.

As the project reached different phases, Cohen created multiple subordinate LLCs, maintained managerial control over all Apex-related entities, and initiated multiple capital calls (capital contributions from the investor LLC members). Apex Apartments, LLC transferred Building A to Apex Apartments I TIC, LLC and Newcomer Apex I TIC, LLC as tenants-in-common. To facilitate financing, Apex Apartments, LLC was reorganized. Apex Apartments II, LLC was created as a new entity to construct and manage Building B. While the names of the interest holders changed, their ownership percentage in the overall project remained unmodified. The transfer of Building A from Apex Apartments, LLC to Apex Apartments I TIC, LLC and Newcomer Apex I TIC, LLC was classified in tax documents as a "mere change in identity," with the transfer involving moving ownership from one LLC to another with the same owner. After the transfer of Building A, Newcomer no longer had an interest in Apex Apartments I TIC, LLC. Newcomer's entire interest in Apex Apartments, LLC was transferred to Newcomer Apex I TIC, LLC. Newcomer's interest remained at 30 and 1/3 percent ownership in the overall project. The three other minority interest members held a 3 percent interest in Apex Apartments I TIC, LLC. Cohen, in his role as manager, clarified that the reorganization into subordinate ownership entities did not alter the relative percentage ownership of the members.

Cohen, acting in his capacity as manager, sought additional capital contributions. Newcomer made a total of $1,509,547 in additional capital contributions over multiple installments from 2006 through 2009. All capital contributions from Newcomer were made via checks payable to Apex Apartments, LLC.

Due to deteriorating market conditions stemming from the housing market crash

4

of 2008, the investment project faced increasing financial difficulties. In February 2010 Newcomer agreed to loan Apex Apartments II, LLC $200,000. Through this transaction, Cohen executed a promissory note with Point Ruston, LLC as maker. Under the agreed upon terms of the note, Point Ruston, LLC obliged to pay back Newcomer his $200,000 loan with 8 percent interest on or before May 10, 2010. However, the loan was not repaid by the agreed deadline.

In 2010 Building B was converted into condominiums and eight condominiums were transferred from Apex Apartments, LLC to Apex Penthouse Condos, LLC. In October 2010, members of Apex Apartments II, LLC executed a second amended and restated limited liability agreement. This newly modified agreement materially altered the ownership percentages of the original members,[4] but the language related to capital contributions, in Section 8 of the Apex Apartments LLC agreement, remained consistent with all other previous agreements.

In November 2010, Newcomer extended an additional $600,000 loan to Cohen, secured with a promissory note. The makers of this note are: 1) Apex Penthouse Condos, LLC; 2) Apex Apartments I TIC, LLC; and 3) Michael A. Cohen personally. The note includes a commitment to repay Newcomer $600,000 at a 20 percent interest rate per annum, compounded monthly. The note's due date was November 1, 2015. Cohen utilized the $600,000 loan to settle the outstanding $200,000 loan owed to

---

[4] The second amended Apex Apartments II, LLC agreement guaranteed a 35 percent interest in the company to JLW Apex, LLC, Silver Cloud, Inc., and James L. Weymouth, President. The original investors, Cohen, Newcomer, and Thomsen, collectively retained a 65 percent ownership interest in the company. Newcomer's personal ownership interest in Apex Apartments II, LLC, now held through the 2009 Newcomer Family Trust, LLC, was 19.72 percent. The remaining primary members and minority members had their ownership percentage interests proportionally reduced.

Newcomer, which had accrued to $212,061.47 with interest.

By fall of 2013, Newcomer wanted out of the partnership and his investment money returned. Newcomer v. Cohen, No. 48233-9-II, slip op. at 8 (Wash. Ct. App. May 16, 2017) (Newcomer I) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2048233-9-II%20Unpublished%20Opinion.pdf. He had learned Cohen, unlike himself, did not make his initial capital contribution and applied a portion of the contribution as a "non-cash" deferred management fee. Id. at 9. In January 2014 Newcomer sued Cohen alleging he violated the Washington State Securities Act (WSSA). Id. at 9.

In April 2014, the entire Apex project was sold to KW Tacoma Apartments, LLC for $26.5 million.[5] The sale proceeds were used to fully repay all construction-related bank loans. This repayment also eliminated the personal guarantees made by Newcomer, Cohen, and Thomsen, but these investors lost their contributions. Newcomer v. Cohen, No. 50247-0-II, slip op. at 6 (Wash. Ct. App. Oct. 30, 2018) (Newcomer II) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2050247.0-II%20Unpublished%20Opinion.pdf.

The proceeds were insufficient to cover the debt owed on Building A to the Bank of America, leaving a shortfall of $1,653,679.23. To address this shortfall, Cohen and Thomsen each loaned the entities of Building A about $824,000. Newcomer declined to contribute to the resolution of this shortfall.

In February 2015 Cohen, as manager of the TIC entities and Apex Penthouse

---

[5] Division Two described the sale occurring in April 2015, but the record and the trial court's unchallenged findings of fact in the instant case support that the sale occurred in April 2014. Newcomer I, slip op. at 10.

Condos, LLC, notified members of another capital call after first giving them the opportunity to loan funds as required by the LLC agreements. Once no member loans were provided, Cohen sent a letter in March 2015 requesting capital contributions from the members.

In September 2015, a jury in Newcomer's first suit found Cohen violated the WSSA with respect to the sale of securities through four capital calls that Newcomer responded to between March 2005 through December 2008. Newcomer I, slip op. at 12. The jury awarded Newcomer recessionary damages of $2,309,552, which equated to the total amount in capital contributions he made to the Apex project.[6]

In March 2016, Cohen unilaterally formulated and independently devised and proposed to implement a "debt cancellation plan." Under this plan the amount owed under Newcomer's promissory note for the $600,000 loan would offset what Cohen asserted was Newcomer's outstanding capital call obligation. Cohen notified Newcomer that the debt from the promissory note had been paid in full by crediting his outstanding capital call obligations in conjunction with the winding up of the Companies.

In January 2016 Newcomer sued Cohen, Apex Penthouse Condos, LLC, and Apex Apartments I TIC, LLC (collectively Apex Entities) alleging breach of contract and unjust enrichment under the promissory note for the $600,000 loan. Newcomer II, slip op. at 7. This suit is the subject of the appeal in the instant case. Cohen and Apex Entities asserted counterclaims, cross claims and third-party claims.[7] One of Cohen's counterclaims asserted that Newcomer was unjustly enriched when Cohen and

---

[6] This court affirmed that judgment. Newcomer I, slip op. at 12.
[7] The following third-party defendants were dismissed by stipulation: Eckstein Investments, LLC; RB&F Property Management, LLC; William Donahoe; Entrust Northwest, LLC; and AMC Family, LLC.

7

Thomsen loaned $824,000 to help clear a debt to Bank of America.  The loan benefited Newcomer, Cohen asserted, because it allowed for the sale of the project to proceed and released Newcomer from his personal guarantee of the bank loan.

Cohen and Apex Entities also asserted setoff as an affirmative defense arguing they had the right to cancel the debt secured by the promissory note in an amount "equal to unpaid capital-call obligations" owed by Newcomer.  After considering multiple motions for partial summary judgment, the trial court ruled that Newcomer had no liability to Cohen or Apex Entities because the LCC agreements were invalid.  Cohen and Apex Entities appealed and this court reversed the trial court's order granting summary judgment to Newcomer and remanded for further proceedings.  Newcomer II, slip op. at 28.  On remand, the trial court held a bench trial in July 2022.

As to the promissory note, the court found in favor of Newcomer.  Defendants asserted that with the creation of each new entity, the initial contribution required for a member to join the new entity is the value of the property transferred to that new entity from Apex Apartments, LLC or any other predecessor entity.  Defendants asserted this reset the additional capital contribution requirement up to the value of that property transfer, thereby increasing each member's capital call obligation.  The trial court found nothing within the formation documents clarifying this valuation methodology, dismissing this argument as one that lacked credibility.

The court found Newcomer's initial payment of $800,000 was specified in Schedule 1 of the Apex Apartments, LLC agreement, which provided that an additional capital contribution could be required up to 100 percent of his original capital contribution, which totaled $800,000.  The court found that Newcomer paid far more

than 100 percent of his original capital contribution of $800,000.

The trial court also concluded that RCW 25.15.196(1)—the liability for contribution statute under the Washington Limited Liability Company Act, chapter 25.15 RCW—does not modify or expand the terms of Article 8 in the LLC agreements. And while LLCs may enforce provisions of their agreements during winding up/dissolution of the entity, under the applicable LLC agreements in the instant case, Newcomer could not be compelled to provide additional capital.

As to Cohen's unjust enrichment claim against Newcomer, the court found Newcomer was unjustly enriched. The court found that had the Apex property not sold in April 2014, the property would likely have been foreclosed by the lenders. The lenders would have enforced the personal guarantees of Newcomer, Cohen, and Thomsen, causing them significant financial harm. Cohen and Thomsen had used other properties, unrelated to the Apex project, as collateral for the loans. Per Section 6.8 of the LLC agreements, Newcomer and Thomsen were obligated to indemnify Cohen and Thomsen. Newcomer benefited from the release of personal guarantee without contributing to the cost. The court found it unfair for Newcomer to retain this benefit without sharing in the associated costs. Consequently, the Court determined that Newcomer had been unjustly enriched to some degree by payment made by Cohen and Thomsen.

The court determined that Newcomer had been unjustly enriched by $551,226.40, one third of the amount of the funds that were insufficient to resolve the debt on Building A owed to the Bank of America. The court granted Cohen's request to use the amount to offset the amount owed on the promissory note. In addition, the

9

court, sua sponte, applied a reduced interest rate of 8 percent per annum, simple interest instead of the rate agreed to in the promissory note because it "would be inequitable for Newcomer to continue to benefit financially from exorbitant interest rate."[8]  The court also found no violation of WSSA was committed in the formation and funding of the LLCs formed subsequent to the Apex Apartments, LLC.  The court also denied Newcomer's claim for unjust enrichment and concluded that all other claims and defenses of the parties are either subsumed in the relief granted or denied.  Finally, the court concluded that because there was no prevailing party, no party was entitled to attorney fees and costs.

Newcomer moved for reconsideration as to the issue of the reduced interest rate. The court requested a response from defendants.  After reviewing the motion, response and Newcomer's reply, the court determined that the promissory note is unambiguous on its face and was negotiated between business sophisticated individuals in an arm's length transaction.  The court then reversed itself and concluded that the court's equitable powers do not extend to making an interest rate adjustment on a commercial loan with a written, fixed rate of interest.  The court amended its findings of fact and conclusions of law to delete the previous conclusion relating to the reduced interest rate and amended its decision to reflect that the sum owed will bear interest at the rate of 20 percent, compounded monthly, until paid.  The court ruled that defendants are jointly and severally liable on the debt as makers on the note.

Defendants appeal the court's rejection of its claim that they properly set-off the

---

[8] The court's initial findings of fact and conclusions of law are not in the record. However, they were quoted in Apex Entities' response to Newcomer's motion for reconsideration without objection.

promissory note debt against Newcomer's capital call obligation, as well as the court's conclusion that it did not have authority to reduce the interest rate on the debt owed for the promissory note. Newcomer appeals only as to the denial of its request for attorney fees and costs under the promissory note.

DISCUSSION

Capital Contribution Requirement

We review a trial court's decision following a bench trial by asking whether substantial evidence supports the trial court's findings of fact and whether those findings support the trial court's conclusions of law. Casterline v. Roberts, 168 Wn. App. 376, 381, 284 P.3d 743 (2012). Substantial evidence is the quantum of evidence sufficient to persuade a rational, fair-minded person the premise is true. Sunnyside Valley Irrig. Dist. v. Dickie, 149 Wn.2d 873, 879, 73 P.3d 369 (2003). The application of the law to the facts is a question of law that this court reviews de novo. Brundridge v. Fluor Fed. Servs., Inc., 164 Wn.2d 432, 441, 191 P.3d 879 (2008). Consequently, we review the trial court's conclusions of law pertaining to contract interpretation de novo. See Mitchell v. Wash. State Inst. of Pub. Pol'y, 153 Wn. App. 803, 814, 225 P.3d 280 (2009).

The primary objective in contract interpretation is to ascertain the mutual intent of the parties at the time they executed the contract. Int'l Marine Underwriters v. ABCD Marine, LLC, 179 Wn.2d 274, 282, 313 P.3d 395 (2013). Washington follows the "objective manifestation theory" of contract interpretation, under which the focus is on the reasonable meaning of the contract language to determine the parties' intent. Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 503, 115 P.3d 262 (2005). And we assess the contract as a whole, interpreting particular language in the context of

11

other contract provisions. See Weyerhaeuser Co. v. Com. Union Ins. Co., 142 Wn.2d 654, 669-70, 15 P.3d 115 (2000). "An interpretation which gives effect to all of the words in a contract provision is favored over one which renders some of the language meaningless or ineffective." GMAC v. Everett Chevrolet, Inc., 179 Wn. App. 126, 135, 317 P.3d 1074 (2014).

Appellants challenge findings of fact 31 and 32, and conclusions of law 1 and 2. We treat unchallenged findings of fact as verities on appeal. In re Estate of Jones, 152 Wn.2d 1, 8, 93 P.3d 147 (2004). All the challenged findings and conclusions relate to the court's rejection of defendants' set-off argument. Appellants do not deny that the language in Article 8 from the Apex Apartment LLC is consistent in all the relevant subsequent LLC agreements. Nor do they dispute that Section 8.2 states "additional Capital Contributions shall not exceed 100% of each Member's Initial Capital Contribution except when approved by the written vote of 100% of the Members." Section 8.1 provides that "[e]ach Member shall contribute such amount as is set forth in attached Schedule 1 as such Member's share of the Members' Initial Capital Contribution." Schedule 1 plainly states that Newcomer's "Initial Capital Contribution" is $800,000, representing "30-1/3" percent unit interests.

Appellants argue, as they did before the trial court, that Newcomer made the $800,000 contribution to Apex Apartments, LLC and $1,509.547 to Apex Apartments II, LLC before Apex Penthouse Condos, LLC was even formed. Thus, they argue, Newcomer did not contribute more than 100 percent of his initial capital contribution to Apex Apartments I TIC, LLC and Apex Penthouse Condos, LLC. Appellants go on to argue that the initial capital contribution to Newcomer Apex I TIC, LLC and to Apex

Penthouse Condos, LLC was the value of the property as testified to by their expert at trial.

The plain language of the LLC agreements belies defendants' assertions. The initial contributions were identified when the project began with the creation of Apex Apartments, LLC. That agreement proclaimed that the "business of the Company shall be: to hold real property in Pierce County and develop apartments and/or condominiums there on." The "Schedule 1" attached to Apex Apartments I TIC, LLC does not identify any "Initial Capital Contribution," but identifies percentage of unit interest for various members. This list is titled "Capital Contributions Member Information." The Apex Penthouse Condos, LLC agreement has a "Schedule 1" attachment that also lists "Capital Contributions Member Information" identified by percentage of unit interest for various members. It also does not have anything identified as "Initial Capital Contribution." These two lists identify how the membership is distributed within that LLC, they do not require or identify a separate "initial capital contribution." As the trial court stated in finding of fact 24:

> The record reflects no evidence of a stated contemporaneous market value at the time the transfer occurred. To allow application of the fair market value of the property transferred at the time the transfer took place should have necessitated some quantification of property value contemporaneous with the actual transfer. Defendants assert this resets the members additional contribution requirement up to the value of that property transfer, for the purpose of increasing a member's capital call obligation. This stepped-up valuation methodology is not detailed with any clarity in the formation documents. This argument lacks credibility in light of the whole of the evidence which, at the time of the transfers, does not reflect the transferred property's reevaluation as being the benchmark for a member's additional capital call.

We agree. Appellants fail to cite to anything in the language of the agreements that support their argument. Because Newcomer had contributed more than 100 percent of

his initial $800,000, the trial court was correct in finding that Newcomer could not be "compelled to provide additional capital in a capital call."

Even if we were to conclude that Newcomer had an obligation to respond to the additional capital call and failed to do so, appellants cite to no authority that allows Cohen to unilaterally choose to use the debt on the promissory note to set off the outstanding capital obligations as a remedy for failure to contribute.

"A member is obligated to a limited liability company to perform *any promise* to contribute cash or property or to perform services, even if the member is unable to perform because of death, disability, or any other reason." RCW 21.15.196(1) (emphasis added). Under RCW 25.15.196(3),

> [a] limited liability company agreement may provide that the interest of any member who fails to make any contribution that the member is obligated to make is subject to specified penalties for, or specified consequences of, such failure. Such penalty or consequence may take the form of reducing or eliminating the defaulting member's proportionate interest in a limited liability company, subordinating the member's limited liability company interest to that of nondefaulting members, a forced sale of the member's limited liability company interest, forfeiture of the member's limited liability company interest, the lending by other members of the amount necessary to meet the member's commitment, a fixing of the value of the member's limited liability company interest by appraisal or by formula and redemption or sale of the member's limited liability company interest at such value, or other penalty or consequence.

In other words, an LLC is free to specify in the LLC agreement what the penalty or consequence is for a member who fails to make any contribution. The agreements in the instant case do not specify allowing the LLC manager to unilaterally choose to off-set what is owed to the LLC by a separate debt. Moreover, Cohen fails to cite any authority that supports allowing an LLC manager to off-set what is owed to the LLC with the manager's own personal outstanding debt. Where a party fails to cite to relevant

14

authority, we generally presume that the party found none. State Constr., Inc. v. City of Sammamish, 11 Wn. App. 2d 892, 906, 457 P.3d 1194 (2020) (citing Edmonds Shopping Ctr. Assocs. v. City of Edmonds, 117 Wn. App. 344, 353, 71 P.3d 233 (2003)).

We affirm the trial court's conclusion that Cohen, as manager of the Apex entities, could not compel Newcomer to provide additional capital in a capital call.

Interest Rate

Appellants contend that the trial court in exercising its broad equitable authority can apply a reduced interest rate to the judgment because Newcomer had been unjustly enriched.

The issue of a trial court's legal authority is a question of law reviewed de novo. Matter of W.W.S., 14 Wn. App. 2d 342, 367, 469 P.3d 1190 (2020). "Unjust enrichment is the method of recovery for the value of the benefit retained absent any contractual relationship because notions of fairness and justice require it." Young v. Young, 164 Wn.2d 477, 484, 191 P.3d 1258 (2008).

> Three elements must be established in order to sustain a claim based on unjust enrichment: a benefit conferred upon the defendant by the plaintiff; an appreciation or knowledge by the defendant of the benefit; and the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value.

Bailie Commc'ns, Ltd. v. Trend Bus. Sys., Inc., 61 Wn. App. 151, 159-60, 810 P.2d 12 (1991) (quoting BLACK'S LAW DICTIONARY 1535-36 (6th ed.1990)). "[T]he proper measure of recovery under unjust enrichment is the market value of the services rendered or the claimant's actual cost to render those services." Young, 164 Wn.2d at 487 (explaining the difference between implied contract in law and implied contract in

fact). In the instant case, Newcomer does not challenge the conclusion that he was unjustly enriched and neither party challenges the court's determination that the value of the unjust enrichment is $551,225.40. Courts have broad discretion in fashioning an equitable remedy, but they cannot overlook the focus of an unjust enrichment calculation. Young, 164 Wn.2d at 489. Under unjust enrichment, "[t]he obligation to repay the debt or disgorge the value of the received benefit focuses on the receiver of the benefit, not on the provider of the benefit. See RESTATEMENT OF RESTITUTION: QUASI CONTRACTS AND CONSTRUCTIVE TRUSTS § 155(1) (1937) (stating 'the measure of recovery for the benefit thus received is the value of what was received')." Id.

As to Newcomer's breach of contract claim for the unpaid promissory note, Newcomer's prayer for relief was the amount of the unpaid loan, $600,000, plus interest at the rate of 20 percent per annum compounded monthly from November 1, 2010 through the date of judgment. The interest rate Newcomer requested are the terms agreed to in the promissory note. The cornerstone of contract law is that agreements freely entered into by parties should be upheld and enforced as written, except where legislation or well-established legal principles dictate otherwise. As commonly recognized by courts across Washington state, "we are loathe to interfere with the rights of parties to contract as they please between themselves . . ." Mgmt., Inc. v. Schassberger, 39 Wn.2d 321, 326, 235 P.2d 293 (1951). It is not the role of the court to enforce contracts so as to produce the most equitable result. The parties themselves know best what motivations and considerations influenced their bargaining, and while "[t]he bargain may be an unfortunate one for the delinquent party, . . . it is not the duty of

16

courts of common law to relieve parties from the consequences of their own improvidence . . . " Reichenbach v. Sage, 13 Wash. 364, 368, 43 P. 354 (1896) (quoting Dwinel v. Brown, 54 Me. 468, 470 (1867)). Therefore, "courts are not at liberty, under the guise of reformation, to rewrite the parties' agreement and foist upon the parties a contract they never made." Seattle Pro. Eng'g Emps. Ass'n v. Boeing Co., 139 Wn.2d 824, 833, 991 P.2d 1126 (2000).

As the trial court observed in its order on reconsideration, "[t]he promissory note in issue is unambiguous on its face and was negotiated between business sophisticated individuals in an arm's length transaction." Appellants do not challenge the validity of the promissory note in any way. Neither party challenges the trial court offsetting Newcomer's award under the promissory note with the value of Newcomer's benefit from the unjust enrichment.

The only question before this court on this issue is whether a trial court can apply a reduced interest rate than what the parties agreed to in the promissory note. Appellants rely on marital dissolution cases, such as In re Marriage of Harrington, 85 Wn. App. 613, 631, 935 P.2d 1357 (1997). In Harrington, we held that a trial court has the discretion to modify the "rate of interest on deferred payments under a property distribution decree," but a court abuses its discretion if it fixes an interest rate below the statutory rate without setting forth adequate reasons for the reduction. Id. But a court exercising its discretion in a dissolution proceeding is contextually distinct from applying an interest rate from a negotiated contract when awarding damages under that contract. The dissolution cases are inapposite.

We conclude that the trial court did not err when it concluded in its order on

17

reconsideration that "the court's equitable powers do not extend to making an interest rate adjustment on a commercial loan with a written, fixed rate of interest."

<u>Denial of Attorney Fees</u>

Newcomer contends the trial court abused its discretion in denying its request for attorney fees and costs. We agree.

"Under Washington law, a trial court may grant attorney fees only if the request is based on a statute, a contract, or a recognized ground in equity." <u>Gander v. Yeager</u>, 167 Wn. App. 638, 645, 282 P.3d 1100 (2012). We apply a two-part review to awards or denials of attorney fees: we review the legal basis for the award de novo, while we review the amount of the award for abuse of discretion. <u>Id.</u> at 647. The trial court abuses its discretion when its exercise of discretion is manifestly unreasonable or based on untenable grounds or untenable reasons. <u>Southwest Suburban Sewer Dist. v. Fish</u>, 17 Wn. App. 2d 833, 838-39, 488 P.3d 839 (2021). "A discretionary decision rests on 'untenable grounds' or is based on 'untenable reasons' if the trial court relies on unsupported facts or applies the wrong legal standard." <u>Mayer v. Sto Indus., Inc.</u>, 156 Wn.2d 677, 684, 132 P.3d 115 (2006).

In the instant case, the promissory note included a mandatory attorney fee clause:

> If any litigation or other proceeding is commenced by a party hereto to enforce or interpret any provision of this Note, or to collect any amount due hereunder, the prevailing party in such litigation or other proceeding shall be entitled to receive, in addition to all other sums and relief, its reasonable costs and attorney's fees incurred both at and in preparation for such trial or other proceeding and any appeal therefrom or review thereof.

"As a general rule, a prevailing party is one who receives an affirmative judgment in its favor." Cornish Coll. of the Arts v. 1000 Virginia Ltd. P'ship, 158 Wn. App. 203, 231, 242 P.3d 1 (2010).

Newcomer, citing the attorney fee provision in the promissory note, requested attorney fees in the trial court. Apex Entities argued that Newcomer should be denied attorney fees, but did not itself request attorney fees. Cohen generally requested to "receive an award of its attorneys' fees and costs in defending this action as may be allowed by law." He also requested attorney fees and costs under RCW 21.20.430, the civil liabilities provision of the WSSA. Notably, Cohen does not appeal the trial court denying him attorney fees. See Burgess v. Premier Corp., 727 F.2d 826, 839 (9th Cir. 1984) ("The purpose of the Washington Securities Act, RCW 21.20.430(1), is only 'to reimburse a purchaser for his actual out-of-pocket loss.'") (quoting Garretson v. Red-Co, Inc., 9 Wn. App. 923, 928, 516 P.2d 1039 (1973)).

It is undisputed that Newcomer is the prevailing party as to his breach of contract claim related to the promissory note. Apex Entities did not request attorney fees and Cohen did not present a basis for attorney fees under statute, contract, or a recognized ground in equity. Accordingly, we reverse the denial of reasonable costs and attorney fees to Newcomer as it relates to his breach of contract claim under the promissory note, and remand for further proceedings consistent with this opinion.

### Attorney Fees on Appeal

Both Newcomer and Cohen request attorney fees under RAP 18.1.[9] Pursuant to RAP 18.1(a), a party has the right to recover reasonable attorney fees on appeal if

---

[9] Apex Entities also requested attorney fees on appeal. Not only are they not the prevailing party, they included only one sentence requesting attorney fees, without citing any

applicable law grants the party the right to recover. Newcomer's request for attorney fees on appeal is based on the attorney fees clause of the promissory note. We generally recognize a provision in a contract allowing attorney fees to include fees on appeal as well as at trial. Edmundson v. Bank of Am., 194 Wn. App. 920, 932-33, 378 P.3d 272 (2016), abrogated on other grounds by Merritt v. USAA Fed. Sav. Bank, 1 Wn.3d 692, 532 P.3d 1024 (2023). Because Newcomer is the prevailing party on appeal, we award Newcomer reasonable attorney fees and costs. Given we are remanding for the trial court to consider Newcomer's previous request for attorney fees and costs at the trial level, we also direct the trial court to determine the same for this appeal.

_____
Coburn, J.

WE CONCUR:

_____
Díaz, J.

_____
Dwyer, J.

---

authority for the request, and thus, did not comply with the mandatory requirements of RAP 18.1(b).